Our second case for this morning is Wetzel v. Glen St. Andrew Living Community. Ms. Lowy. Good morning, Your Honors. May it please the Court, my name is Karen Lowy. I'm here on behalf of Plaintiff Appellant Marsha Wetzel. When housing providers offer homes for rent, the Fair Housing Act imposes upon them an obligation to eliminate discrimination in renting out their properties and to ensure the equal housing opportunity of their tenants. Ms. Wetzel is seeking to hold her landlords to that obligation. She brought this case for two reasons. One, to put an end to the months and months of relentless verbal and physical harassment, threats, and abuse she experienced because of her sex and sexual orientation. Now these were incidents she regularly reported to the management of the facility. That's correct, Your Honor. As the complaint plainly alleges, over and over, she made the defendants aware of this harassment. So you're analogizing this to Burlington Industries against Ellerth and Farragher against City of Boca Raton? That's exactly right, Your Honor. This is a hostile housing environment claim where the defendants are liable for their negligent failure to put an end to the harassment. Ms. Lowy, you and HUD in its rulemaking effort, you and your briefs, assert repeatedly that there is really nothing new here in this tenant-on-tenant harassment liability for landlords. And you in the amicus brief cite a few cases. But did any of those cases actually impose such liability on landlords for tenant-on-tenant harassment? So this precise issue is an issue of first impression in this circuit. But the Eighth Circuit imposed exactly that liability. The Eighth Circuit reversed summary judgment in favor of the defendants, correct? That's correct. Has any court, as I say, HUD says there's nothing new here, right, in its rulemaking? That's correct. And you all say there's nothing new here. And yet I don't see any case cited in which a landlord was held liable for tenant-on-tenant harassment. So you're right, Your Honor, that none of them in the end had reached that conclusion. But the Eighth Circuit's ruling in Newdecker v. Boisclair and the cases that have cited that, both in this circuit and across the country following suit, have recognized the viability of such a claim. Moreover, the cases in this court that have recognized the viability of a hostile housing environment claim did so in recognition of the nearly identical language and required parallel application of claims under the Fair Housing Act and Title VII. I understand the idea that our cases don't foreclose your theory. But this seems to me like a pretty dramatic extension. And it took a long time under Title VII for people to realize that a hostile environment would be a form of liability. And we have all the judge-created doctrine under Farragher and Ellerth to try to manage that liability fairly. And yet under the Fair Housing Act, this is all essentially brand new. I disagree only to the extent that this Court's been very clear that the Fair Housing Act and Title VII are parallel and receive the identical application. And so all of that body of case law under Title VII is directly relevant. It just translates one for one. It does, Your Honor. So a landlord confronted with a complaint like this, what options does the landlord have? That depends, Your Honor. And the question of the scope of the landlord's authority and ability to take action is a matter of fact, is something that the trial court is fully within its capacity to assess and determine. Is that going to depend on the language of the lease, for example? So I'm thinking in this particular case, Ms. Wetzel's lease not only included what I'll just call the right to live in her apartment, but it included three meals a day, it included substantial rights to participate in the common areas, the dining room, the meals, the laundry room, the lobby, and that this harassment actually largely seems to have occurred in those common areas. That's true, Your Honor. And the tenant's agreement is one source that the trial court will be able to look to, both in terms of what exactly the terms and conditions were and what the privileges were and the facilities and services that are intended. So what happens if we agree with you and landlords respond by, HUD seems to be worried about this possibility, the landlords respond by putting provisions in the lease, but we are undertaking no duty to protect you from verbal harassment by other residents? Or physical harassment, certainly. So as I was saying, the tenant's agreement is one source that the trial court can look to, but the Fair Housing Act itself imposes obligations on the landlord. And as the amicus brief actually from AARP was really helpful in laying out some of the practical tools that landlords and in particular senior living communities have at their disposal, there may be written warnings, there may be rent abatement, there may be moving the harasser to another facility. What exactly a landlord has at his or her disposal is going to depend on the particular circumstances, as I said. So let's tell you, well, let me ask you about the scenario that worries me a lot, if we accept this theory. Two tenants get into a feud with one another. And over a period of time, in essence, there are various slurs, horrible slurs used, whether it has to do with sexual orientation or sex or race. We've seen these cases from around the country. Each of the tenants complains to the landlord about the other. As I understand the HUD regulations, the landlord is not allowed to take any corrective action against the complaining party, right? Certainly not in response to the particular complaints, that's correct. Right. So what if the landlord gets competing complaints about race or sex from two tenants complaining about each other? Well, Your Honor, I think that's something that's uniquely within the capacity of the district court to sort out. You're going to have to do a little better than that when you're talking about imposing a very substantial liability on a landlord who doesn't get it exactly right. Right. So you must have some analogies to workplaces there. Exactly. Because this does happen in workplaces. I have a different kind of question about the HUD regulation, which is suppose HUD tomorrow decides that this was an ill-conceived regulation and they abrogate it effective immediately. Does that do anything to your case? No, Your Honor, it doesn't. And if I may just take one last moment to respond to Judge Hamilton's question, I think the important thing to remember here is that this requires an allegation of severe and pervasive harassment that is animus based. Actually, the word is or in all of the- Or, that's correct, Your Honor, thank you. Title VII. It's severe or pervasive harassment that has the effect of completely upending her equal housing opportunity. And so when you've got something that devolves into just a dispute between neighbors, that's not something that's actionable under the Fair Housing Act. So if we put to one side the verbal aspect of this and just said landlords maybe could evict both people if they devolve into fisticuffs or if they are physically assaulting one another or spitting on each other or in other ways misbehaving, would that be possible? I think that's conceivable, Your Honor. I do think there are also other- Or who? There are other tools that landlords have at their disposal. And those are? Those are also there are duties under tort law. There are general business operations that may come to bear as well. Those may be forms of liability. What steps? What corrective action? That's the phrase from the regulation. There are fines. There are warnings. There are threats of eviction. Fines? Certainly. A landlord, if you violate the rules of your apartment building, if you cause destruction to the property, there may be ways in which there can be penalties imposed within the housing. Any due process requirements in that? This isn't a state actor. So, no, I would say there are no due process requirements in there. Really? Really, Your Honor. This is a private interaction between the landlord and the tenant. That's where the problem lies, isn't it? Well, I'm not sure it's a problem. I mean, you just stated what the difficulty is here. The private individual you're referring to is really taking the state's position of prohibiting and doing away with discrimination. Well, that's something that's explicitly authorized by the Fair Housing Act, which allows private individuals to seek. No, but your response to Judge Hamilton was it doesn't apply? It doesn't apply in terms of the ability of a landlord to impose penalties on a tenant. Well, the landlord violated a deposit, you know, and if there's, I mean, I could imagine maybe we're getting a little bit far afield, but we all know that landlords have the power to regard certain conduct as grounds for eviction. So if one of the tenants is using illegal drugs in their unit, pretty much every lease I can think of says we get to evict you for that. Maybe there is, you know, if somebody is smoking in their unit, maybe you can say, even though that's not illegal per se, in the same way that using cocaine would be, we can evict you for that. Maybe if you say, you know, you've been assaulting the other tenants, you are beyond what we have, what our contract is. So the Fair Housing Act, which is part of the broader Civil Rights Act, does impose the duty of non-discrimination. We said in Block Against Frischholz that that extends beyond the moment of signing the lease or the moment of purchasing the condo. So I think you can, I mean, there are actually suggestions in some of the briefs about what steps might be taken. Some steps might go too far, you know. I don't know about fining. That sounds, if it's not built in, say, you know, you can take the deposit if somebody destroys part of the apartment. You know, there are cigarette ashes all over the rug and they have to fumigate the place and put a new rug in. Well, sure, you take the deposit. The point, Your Honor, is I think that these are matters that are well within the authority of the trial court to sort out, based on the particular circumstances of the case. At this point, we're- Ms. Lowy, could I ask you, can a government landlord evict a tenant because of that tenant's hateful speech that stops short of fighting words? Well, Your Honor, where that, where those words rise to the level of perpetrating severe and pervasive harassment, that's no longer in the realm of protected speech. So, I mean, so you're saying if somebody were an employee of the Federal Housing Administration and that person's co-employee used hateful racial epithets against them day in and day out, day in and day out, that the FHA would be entitled to fire the abuser? Yes, Your Honor. That's clear. Yes. That's clear. And so that's what I'm trying to say here. The question has to do with the linkage. The problem is carrying that forward outside of an employment environment, where the employer has control over both employees in question. That's why I asked about hateful speech that falls short of fighting words that would not be protected under the First Amendment. So, I think the question under the Fair Housing Act is really precisely that, is whether the speech has risen to the level of severe or pervasive harassment that disrupts, that sufficiently interferes with the equal housing opportunity. So, hateful speech, it sounds like you want to impose legal restrictions on hateful speech, right? If you're saying the government can evict somebody for that, right? I'm saying that injunctive relief may be warranted to the housing provider to take that action. If the individuals had a particular president or presidential nominee that they supported, and there was very, very nasty things said about it, it amounted to harassment. Is that subject to the same? No, Your Honor. Political speech is quite different. What we're talking about is targeted harassment that is animus-based and that deprives an individual. That's what based? Animus. That is because of the person's protected traits. That is what the Fair Housing Act prohibits. So, essentially, I think what these questions are getting at is to what extent is there a theory of harassment in the Fair Housing Act? And I think, Your Honor, the response is that it is identical to the theory of harassment under Title VII, which is well-established, and there is not a First Amendment defense to being fired for engaging in discriminatory harassment. Can a public employer fire an employee because of private expressions of, let's say, religious bias? It depends on whether or not that has created a hostile work environment. If it has created a hostile work environment, then yes. But here, again, I want to be clear. We're not talking about asking the landlord to take responsibility for what the other tenants have done. We're asking them to ---- Sorry? I thought that was exactly what you were doing. No, Your Honor. This is not vicarious liability. This is direct liability for their own negligent refusal. For failure to stop it. That's correct. Okay. I don't see a big difference there, but at least once the landlord has notice. Which can be, in the Title IX cases, a critical moment because the landlord might not have any notice if somebody's just being rude day after day in the dining room. That's right. There's no question about the clarity of these. And there's absolutely no duty on the landlord for things that the landlord knows nothing about. Or shouldn't have known about. That's correct. Well, that's interesting. I think we can extend this a little bit if you have more questions. I realize I haven't answered Your Honor's questions about the HUD rule. No, no. It's all right. Maybe a little rebuttal. All right. Why don't you sit down and I will give you a couple minutes for rebuttal. Thank you, Your Honor. Ms. Houston. Thank you. May it please the Court. I'd like to remind the Court that the plaintiff is not alleged that the defendants here acted with discriminatory intent or animus. And the same is true of all people who are caught up in sexual harassment cases when it is co-employee, supplier, customer-based. The problem in those cases is that when the employer is told about it, the employer does nothing about it. And that's the model we have here. Nobody is saying that Glenn St. Andrew had to stand there and applaud when Mr. Herr knocked her out of her chair. But she complains to them and they shrug their shoulders. They don't do anything. And I would like, as you present your argument, for us to focus on the physical acts of violence she suffered, since this is certainly not a speech-only case. All right. I think there's an important foundational element or principle here that seems to be getting conflated. And I think going back to our foundational elements can clear this up. And that is, and there are two cases. One that you've referenced, and that's Burlington v. Elrath, and the other is Holly v. Myers. And they elucidate the situation here. Let's talk about Holly v. Myers first, and then Burlington, because they're critical to understanding the liability. In Holly v. Myers, the court explained that the FHA embodies traditional tort principles, but not modifications of it. And in Holly, you may recall, they tried to impose liability on the corporate shareholder. And the court said under traditional principles of liability, the corporation is liable for its employee, but not the shareholder. Because there's no agency relationship. But the agency relationships, I know you focus on this quite significantly in your brief. That's not the only kind of relationship that exists. There is, at a minimum, a contractual relationship between a landlord and a tenant. And part of that contractual arrangement is furnished by law, the implied warranties of habitability, of quiet enjoyment. Part of it is imposed in the written lease. And if you're trying to tell me that a landlord has no authority to say to tenant A, you may not deprive tenant B of access to the common areas, I would disagree with you. Not seeing that at all. Yes, it is. That is the gist of your argument, because that is what Mr. Herr was doing. He was pushing her out of her chair, causing her to be injured, and constructively evicting her from the common areas of this building. She can't go in the lobby to buy her coffee. She's afraid to go eat in the dining room. So it's not quite the same as an employer-employee where there's a principal and an agent. But here we have a contractual relationship where party A is giving access on certain conditions to party B. And I'm going to address both those. I need to address the agency issue and then the contractual issue. But I'm already off the agency issue. I know that a landlord is not an agent of a tenant. Agreed. But a landlord can say, you can be a tenant in my building only on certain conditions, only on the condition that you don't smoke in your room, only on the condition that you don't use cocaine in your room, only on the condition that you don't assault other people, whether they are visitors, whether they are tenants, in the common areas. And if you violate those conditions, then we no longer have a deal. The HUD regulation and what counsel just talked about. Can we not talk about the HUD regulation? Because I, frankly, don't think it has anything to do with this case. Direct liability for negligence. That's what has been raised here. And that's what Burlington speaks to. And that's what goes to the agency relationship. This Court is well aware of Burlington. Having been through all of the phases of Burlington, you're speaking to the person who was on the panel of the original three-judge panel before it went to the Embankment Court and produced a 209-page opinion before it went to the Supreme Court and got linked with Farragher. So you are well aware that direct liability for negligence occurs because of the agency relationship, which isn't here. No, because the employer knows about what's going on. As I'm saying, it happens to be agency. But I don't see anything that says only if it's agency. Yes, the Supreme Court looked at the restatement of agency. At that time, the restatement second of agency was the best one out there. But I don't see anything that says it's part of the contractual relationship, especially given the fact, after block against Frischholz, that the Fair Housing Act applies after the moment of signing the lease. A landlord has legal responsibilities to the tenants in a facility. Absolutely, and it's contractual. You think they don't because it's just because it's not agency. No, that's not true. That's exactly what you're arguing. No, I think that let's look at the landlord-tenant relationship. It's contractual in nature, as you point out. It's two independent parties contracting to rent space. And it's governed by the Fair Housing Act, so the landlord has some duties that are redressable in conventional tort to the tenant. Absolutely. And if the landlord fails to live up to those duties, the tenant has a tort lawsuit. If the landlord or the landlord's actions. I totally agree with you. And the landlord here is told, this is why it becomes the landlord's action, is told about what's going on, critical, just as the Supreme Court said in the Title IX cases. The landlord is told about what's going on, and the landlord dismisses it. The landlord says, we are making a conscious decision not to do anything. It's a little bit like the Glisson case that we had in a somewhat different area where a decision not to act is an action. I understand. Is there a duty of the landlord to intervene in a private dispute? Yes, when the private dispute means that somebody is being thrown out of, on the basis of a protected characteristic, being physically assaulted in the common areas of the facility, how can there not, under the Fair Housing Act, be a duty to intervene? Would you be making the same argument if it was a racist tenant who was physically assaulting an African-American? The same argument applies across the board, whether it's race, color. So you think it's fine for a racist tenant to assault an African-American co-resident. I do not think that. A co-resident who then goes and complains to the landlord, and the landlord says, oh, well, that's just life is hard. Because now you have given a hypothetical where 3617 is being violated. Why do we not have 3617 violated here? The plaintiff can then bring an action. Against whom? Against the harasser. No, against the landlord. Why? Because the landlord had the power to take action, chose not to take any action, is maintaining a harassing, in this instance a racially harassing, place of the vote. I think the police can intervene. I think that the victim can bring actions against the harasser. But I disagree that the landlord has a duty. Because if you look at Illinois law and landlord law, they said you don't have to protect the tenant. So, in other words, you think there's no link whatsoever between this case and Farragher, Ehlers, harass, you know, hostile environment theory. Your theory is that there is no hostile environment theory under the Fair Housing Act. No, I think there can be a hostile environment. No, you don't. Caused by the landlord or the landlord's agents. The difference is how far do we extend liability. You don't think omission to act can do anything. The landlord can stand there and watch somebody pummel someone because of their religion, because of their race. If they fail to act because of discriminatory intent, then it's actionable. And that's why discriminatory intent is such an important part of the element of this statute. And one of the problems here is if you are saying, and I think the cases do say, that if a landlord fails to take action, but I think what you're really saying is the landlord contractually needs to take these actions based on contract. Partly contract, partly the warranties of habitability and quiet enjoyment. And then partly the Fair Housing Act. I'm having trouble seeing where you think the Fair Housing Act actually applies to this situation. And if I'm understanding you correctly, you don't think it does. I think that the Fair Housing Act governs the behavior. The Fair Housing Act was enacted to provide access to housing primarily, and the purpose is to eradicate intentional discrimination. And 3604B says you can't have discriminatory conditions and terms, et cetera, in the lease. And that directly impacts the landlord, and the landlord must comply with that, and its agents must comply with that. And separate and apart from that, 3617 is unique to Title VIII. It's not there for Title VII. Title 3617 says where this pervasive, severe or pervasive conduct rises to the level that it's violent and intimidating and would drive a person from their home, it's actionable against the harasser. Where does it say actionable against the landlord? We have also recognized, first of all, that something short of constructive eviction, and now she has actually been constructively evicted from the common areas, not from her. Well, let's back up there. No, she hasn't. She alleges that she doesn't dare go down there. She has some caretaker bring food. Well, we have to be objective and subjective here. What we have is a situation where two elderly people go at it every time they get in close proximity to each other. Well, let's not emphasize the elderly. There was some unfortunate language in your brief about that. The point is these two private individuals. He assaulted her physically. She did not assault him physically. I believe there were two instances, and she's on a powerful motorized scooter, and he is feeble enough that he has to be in a walker, and they did collide. It's true. But we have to take the allegations in the complaint, and your opponent says you have used the word collide. That's not the allegation in the complaint. And so at the moment we're stuck with that. You might be able to prove what you're saying. The allegations in the complaint also say that, at least on the second incident in the elevator, that another tenant came forward and said it was, in fact, Mr. Herr. A question of fact that can be explored later. Could I ask questions on some aspects of the case that trouble me on your side, Ms. Houston? The retaliation claims that are being asserted under 3617, did you move to dismiss in the district court on any ground other than the failure to allege intent? As your brief talks about causation, too much time, no adverse action, were those issues raised in the district court? They were not raised by the plaintiff. I don't believe those were. In your motion? In our motion. No, it was intent. Just intent. Okay. Now, the thing that concerns me here is that you seem to be reading Block and the East Miller decisions as if there's a kind of dual intent requirement for a retaliation claim. Yes. And I guess I'm not seeing how you get there, because that, among other things, would be unique in federal retaliation law. Ordinarily, it's just enough to allege and then prove the intent to retaliate for the protected conduct. Well, in the cases that are governing from the district court, they all have held Grubbs, Dudley, Davis. You're talking about district court decisions? Pardon? You're talking about district court decisions. I'm talking about understanding some ambiguous language in our opinions, and I don't see how we get the dual intent requirement, let's say, out of the statutory language. Because if you're moving under 3617, 3617 has a discriminatory intent requirement, and you can't just throw that out the window, even if the cause of action Is that different from retaliation? Yes, it is different from retaliation. Because you're retaliating with an intent to discriminate. I think there is a difference. Can you point me to any other? Retaliation provisions are pervasive in federal law. Yes, they are. Any others that have this dual requirement? I have to be honest with you. I haven't looked at others. I only looked at the case law that I could find with respect to retaliation in the fair housing context. And then I also wanted to check with you. You've argued on this question of landlord liability for tenant-on-tenant harassment. You've argued that the statutory language does not allow for this liability, in particular in your attack on the HUD regulation. And yet, we have essentially identical language in Title VII of the Civil Rights Act that hasn't been construed that way. Yes, that's true. So how does the statutory language foreclose this possibility? It has to do with agency, and I don't mean to set the court off. But the co-employees are not one another's agents. But the servant-master relationship is so powerful. No, but that's the person who can do something about it. If I may, the other problem is that in Title VII, there can be employer liability for failure to protect an employee from customers, from outside actors as well who are not agents of the employer. Absolutely, because the employer controls those employees and controls that environment. Controls the suppliers and the customers? He controls the workplace that he forces the employees to come to, if the employees have agreed to. That's why the employer has a duty to protect the employees, but the landlord doesn't. And the landlord doesn't control the premises? The landlord doesn't have the same duty to protect the tenants. And the whole notion here is that. Suppose the landlord doesn't shovel the snow outside. That runs with the land. And the tenant falls down. He's going to be liable. He runs with the land. The landlord controls the premises. Suppose there's a giant spill in the lobby and somebody slips and falls. The landlord is responsible. There is a tremendous amount of employer liability for the landlord. Right, but does the landlord get to tell the tenants how they're supposed to think and when they can think it and what they can say and how do you monitor that? No, does the landlord get to tell anybody? Two strangers, two guests who come in who start punching each other. I bet you would say the landlord could throw them out. Two guests because the landlord controls the premises. And if one guest comes in and takes a swing at one of the tenants, the landlord also has the ability to control that. You would have that ability to call the police and have them thrown out. And you can also, yes, throw them out yourself, just like stores can throw out shoplifters without the police coming. So, anyway, why don't you wrap up and we will hear a little bit more. Could you just briefly, what's the size of the, how many people are in this facility? I don't know the answer to that question. I'm sorry. I thought the record showed that there were about 102 independent living units and maybe about 33 assisted and then some further something in that region, I believe. Judge Wood obviously knows. The, it, well, if you can't tell me how many there are, you probably, I won't even proceed with it. Go ahead. I might be able to. Give it a try. What's the physical layout? How is it set up? Describe the facility. I can because I went out to look at it because I was curious about the dining room incident. And it's a rectangular, for example, the dining room is rectangular. There are small tables of four so people with wheelchairs can get to them. They're identical. There isn't one that's better or worse than another. The hallways are wide. They have multiple areas. Is it a new construction or relatively new construction? No, it's an older construction and reconverted. And so they have various levels, floors where tenants have their apartments. And then they have multiple areas, gathering areas. Yes, there is a front lobby, but there's a back area as well. There's numerous outdoor areas. There are multiple areas. How many stories? How many levels? I believe it's three, no, five stories. With elevators? Yes. So Paragraph 12 of the complaint says, the subject property includes a 55-bed intermediate care unit, 47 units of assisted living, and 107 independent living apartments, which are intended as residences for older adults. And I don't know whether you contested that, but that's what it's alleged. Thank you, Your Honor. No, I did not contest that. There's one last question I need to ask you, I think. And that is, the Fair Housing Act uses the term sex. Yes. Do you agree that that extends to sexual orientation? Absolutely. Based on Hively? Yes. Okay. We've gone past that issue, but there is a circuit split at this point under Title VII. I think Hively was correctly decided. I think it should cover all. Okay. Thank you. All right. Well, we thank you for your presentation. Thank you, Your Honor. And we will give you two more minutes, Ms. Lowy. I think that will somehow balance things out. Unless somebody has questions, in which case it will take longer. Thank you, Your Honor. A couple of points I'd like to address. One is that I agree with you that in the long run the HUD rule is irrelevant. This claim was brought pursuant to the statute. The complaint was filed a month before the rule came down. And consistently, Ms. Wetzel has simply urged that the rule supports her interpretation of the statute, which is supported by the statute. But this complaint came before the rule was issued. This complaint came before it, and it came after the motion to dismiss as well. So it is not the basis for her claim, but it certainly supports her claim. And, frankly, from Ms. Wetzel's perspective, as addressed in the brief, it is a rule that is worthy of deference from this Court. So you are relying on it? We agree that it's supportive and is worthy of it. But, frankly, if Your Honors took no notice of it, nonetheless her claims would proceed directly under the statute. Counsel, we talked about the ownership. So several different corporations apparently own it. Is that correct? That's correct, Your Honor. What's the nature of the owners? Describe them, if you would. Sure. The respective corporate defendants here are three corporate entities. The precise contours of the ownership of the land and of the building themselves and the management of the building are what's set forth in the complaint. The corporate entities, Ms. Wetzel has brought claims against under theories of vicarious liability. Are these for-profit corporations? They are, Your Honor. That's amazing. It's a for-profit corporation. The other point that I wanted to address, Your Honors, is that there seems to be somewhat of a conflation by my opposing counsel of the source of the duty to address the discrimination and the ability of the defendants. It has been subject of considerable debate, even within HUD, right? So what do you think the answer is? Your Honor, the source of the duty is the Fair Housing Act itself. The Fair Housing Act itself makes it unlawful to discriminate because of the protected traits, and it imposes the obligation to eliminate discrimination on a housing provider. The contractual relationship that the Chief Judge was referring to goes precisely to the power of the landlord to provide a remedy, to control the environment, exactly as you had stated previously. Here, we have a clear duty. We have allegations of the defendant's ability to control, and the precise contours of that is something that will get sorted out by the trial court. There's one other point that I wanted to address, and that is the dual intent requirement. You had previously said there is no dual intent requirement anywhere in the language with regard to retaliation claims. But frankly, Your Honor, there is no dual intent requirement anywhere in the statute. The only thing that the statutory language requires is that the discrimination happen because of the protected trait. Here we've got ample allegations that the harassment was fueled by discriminatory intent, and in refusing to take action to put an end to the hostile housing environment, the defendants have discriminated because of her sex and sexual orientation. It's very clear, Your Honor, no one has disputed that the highly interpretation of the scope of federal sex discrimination protections applies here to this Fair Housing Act claim. And so, Your Honors, we would request that the reversal be overturned, that her Fair Housing Act and Illinois Human Rights Act claims be reinstated and the matter be remanded. All right, thank you very much to both counsel. We will take this case under advisement.